**Gail MACKEY, and 7 Valleys Equipment Company, Inc., Respondents,**

v.

**SECURITY BANK OF SOUTHWEST MISSOURI, and Jon Horner, As Trustee, Appellants.**

No. SD 30901.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 7, 2011.

Mark C. Fels, Yates, Mauck, Bohrer, Elliff & Fels, P.C., Springfield, MO, for Appellants.

J. Michael Riehn, Cassville, MO, for Respondents.

ROBERT S. BARNEY, Judge.

Security Bank of Southwest Missouri ("the Bank") and John Horner as Trustee ("Mr. Horner") (collectively "Appellants") appeal the trial court's judgment that found in favor of Gail Mackey ("Gail") and 7 Valleys Equipment Company, Inc. ("7 Valleys") (collectively "Respondents") in its determination that a certain promissory note and deed of trust were invalid and that the Bank and its trustee were perma-

nently enjoined from foreclosing on the aforementioned deed of trust. Appellants assert three points relied on. We reverse the judgment of the trial court.

Viewing the evidence in the light most favorable to the trial court's judgment, *Blackburn v. Habitat Devel. Co.*, 57 S.W.3d 378, 385 (Mo.App.2001), the record reveals that 7 Valleys was incorporated by Gail and her husband, Daniel Mackey ("Daniel"), in 1991 and the couple were the sole shareholders.[1]

In August of 1998, 7 Valleys purchased a tract of residential real estate located on Vine Street in Cassville, Missouri ("the Property"), where the Mackeys resided until their separation in 2002 when Daniel left the home and Gail continued to reside there.[2] 7 Valleys financed this purchase with the Bank giving its promissory note in the amount of $190,000.00 and a deed of trust securing it ("the 1998 loan"). As best we discern the record, both Gail and Daniel signed as personal guarantors as well. This transaction closed on August 28, 1998, and the documentation was signed by Daniel as "president" and Gail as "secretary".[3]

In preparation for the aforementioned transaction, certain corporate formalities were undertaken by 7 Valleys. On July 31, 1998, 7 Valleys executed a "CORPO-RATE RESOLUTION," which stated the following under the heading "BORROW-ING AND SIGNING AUTHORIZA-TION:"

[b]e it resolved ... that any 2 of the persons listed on Schedule D[are] au-thorized to sign any promissory notes, drafts, instruments or agreements ... of this corporation[;] and [are] further authorized to borrow from time to time on behalf of this corporation from the said bank such sums of money for such times and upon such terms as may to them or any of them, seem advisa-ble....

Schedule D attached to this resolution in-cluded the signatures of Daniel as presi-dent and Gail as secretary. This docu-ment also stated that it was to "continue in force until express written notice of its rescission or modification has been re-ceived by the said bank...."

A second document, entitled "CORPO-RATE AUTHORIZATION RESOLU-TION" was executed on that same date. This document indicated that "any person listed below ... [is] authorized to ...," among other things, "[b]orrow money on behalf and in the name of this corporation, sign, execute and deliver promissory notes or other evidences of indebtedness ..." and to "mortgage ... real estate or other property now owned or hereafter owned or acquired by this corporation as security for sums borrowed...." Both Daniel and Gail's signatures appear on this document as having the power to take the aforemen-tioned actions. This document also provid-ed that it would remain in effect "until express written notice of its rescission or modification has been received and record-ed by this Financial Institution." Thereaf-ter, the mortgage agreement with the Bank was extended on several occasions.

---

1. We use the first names of the Mackeys for ease of identification. We mean no disre-spect.

2. Gail filed for dissolution of the marriage in December of 2002. On March 10, 2008, after all loans under consideration in this litigation had been made and monies disbursed, the Circuit Court of Barry County awarded Gail "[a]ll interest or shares of stock in [7 Val-leys]."

3. The documentation associated with this transaction was in the name of "7 Valleys Equipment, Inc." as opposed to the entity's proper name of "7 Valleys Equipment Com-pany, Inc."

On December 28, 2001, the Mackeys signed a "TERM LOAN EXTENSION AGREEMENT" as well as an additional extension agreement on November 6, 2002. The 1998 loan with the Bank was then extended again on October 29, 2003; October 19, 2004; and November 3, 2005. These latter three extensions were not signed by Gail and, instead, were signed solely by Daniel.

In the latter part of 2005, while the Mackeys' divorce was still pending, Daniel contacted the Bank about refinancing the 1998 loan to borrow an additional $65,000.00 to "settle up with the Attorney General's Office on a Workers' Compensation insurance claim." Ultimately, the Bank discovered that 7 Valleys had been administratively dissolved by the Secretary of State in 2001 for failing to file its annual report, but was reinstated after Daniel filed annual registration reports for the years 2001 through 2006 on March 1, 2006.[4]

In preparing the refinancing documentation, the Bank requested that Daniel provide it with a copy of the minutes of the 7 Valleys' board of directors meeting at which the mortgage of the Property was approved.[5] Daniel then provided the Bank with minutes from a meeting purportedly held on January 12, 2006, at the Rib Restaurant in Cassville where Daniel and Mr. White were shown as present. The minutes from this meeting reflect that the

corporation resolved to "authorize current President/Secretary, [Daniel] to accept and sign on behalf of the corporation the new deed and mortgage of $225,000 at [the Bank]...." The minutes also authorized Daniel to correct the original loan documentation which incorrectly stated the full legal name of 7 Valleys.

On March 13, 2006, the refinancing of the 1998 loan closed with Daniel executing a promissory note and deed of trust and other documents as both president and secretary ("the 2006 loan").[6] Incident to the refinancing, the outstanding balance on the 1998 loan, the amount of $123,698.05, was paid in full. Gail's signature does not appear on any of the 2006 loan documentation and there were no documents showing she guaranteed the 2006 promissory note.

At trial, Gail denied having knowledge of this transaction as it was taking place and related she further was not informed of the transaction by the Bank. Later, in the summer of 2006, Gail apparently learned of the 2006 loan; however, it was not until the Bank began foreclosure proceedings against the Property over a year later that she took any action.

In December of 2007, both Gail and 7 Valleys eventually filed their "SECOND AMENDED PETITION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION

---

4. In the documents filed with the Secretary of State after the rescission of the dissolution, the Mackeys' son, Jason Mackey ("Jason") is listed as president; Daniel is listed as secretary; and Lonnie Creech is listed as the sole member of the board of directors in the 2001 and 2002 annual registration reports. In the 2003 and 2004 annual registration reports, Daniel is listed as president and secretary with Lonnie Creech listed as the sole member of the board of directors. The 2005 and 2006 annual registration reports list Daniel as president and secretary with Skip White ("Mr.

White") listed as the sole member of the board of directors.

5. Jason testified that it was about this time that he contacted the Bank and informed it that it was not to accept any paperwork on behalf of 7 Valleys that was not signed in person by him.

6. On March 18, 2006, Stewart Title Guaranty Company duly issued its policy insuring the Bank for $225,000.00 on the loan.

AND PETITION FOR DECLARATO-RY JUDGMENT" in which they sought to enjoin the Bank from proceeding forward with its foreclosure of the Property scheduled for December 28, 2007. Gail and 7 Valleys each generally averred Daniel had forged and presented fraudulent documents to the Bank to obtain funds necessary to purge himself from contempt of court on the worker's compensation issue by obtaining the 2006 loan; that Daniel forged documents and the corporate resolution to indicate that the shareholders had approved said documents and pledged the Property as collateral without "authority to execute the note and deed of trust dated March 13, 2006[,] on behalf of [7 Valleys];" and that as a result of the fraud and misrepresentation of Daniel he obtained an additional $65,000.00 from the Bank after pledging the Property as collateral, thereby increasing Gail and 7 Valleys' liability on the original note without their knowledge and consent. Saliently, Respondents do not assert the Bank conspired with Daniel to defraud them. Rather, Respondents maintain the Bank "knew or with the exercise of reasonable diligence should have known" of Daniel's fraud or misrepresentation. Specifically, in the petition Respondents sought in Count I a temporary restraining order, preliminary injunction and permanent injunction to prevent foreclosure on the Property; in Count II Gail sought a declaratory judgment declaring the deed of trust dated March 13, 2006, to be invalid and unenforceable; and in Count III 7 Valleys sought a declaratory judgment declaring the deed of trust dated March 13, 2006, to be invalid and unenforceable.

In their answer Appellants admitted Gail had executed an individual guaranty of the 1998 loan; denied all pertinent allegations against them; and asserted affirmative defenses that Gail and 7 Valleys each lacked standing to seek to enjoin the foreclosure of the March 13, 2006, deed of trust. Then, in their Counterclaim against Respondents, Appellants set out that if the trial court ruled in favor of either or both Respondents and declared the March 13, 2006, deed of trust securing the loan made by the Bank in the amount of $225,000.00 to be invalid and enforceable, Respondents would be unjustly enriched if the trial court

> did not also exercise its equitable jurisdiction to declare revived the lien of the 1998 [d]eed of [t]rust to the use and benefit of [the Bank], at least to the extent of securing an amount equal to the balance of $126,099.97 on the 1998 [n]ote as of March 13, 2006, when the 2006 [d]eed of [t]rust was executed.

Appellants set out that there was no adequate remedy at law to seek re-imposition of the lien of the 1998 deed of trust and pled that equitable relief was both necessary and appropriate. Further, Appellants asked the trial court "for a declaratory judgment ordering, adjudging and declaring the revival of the lien of the 1998 [d]eed of [t]rust" securing the payment of a sum not less than $126,099.97.

Two hearings were subsequently held. At a December 18, 2007, hearing, the trial court considered Respondents' motion for a temporary restraining order. At that hearing, Mr. White testified that although he was friends with Daniel, he had never heard of 7 Valleys; had no knowledge he was listed as a director of 7 Valleys; and knew nothing about "any of this." He also testified that he did not attend a board of directors meeting at the Rib Restaurant in January of 2006.

Thereafter, at a March 10, 2010, hearing, Mr. Horner testified he was aware

Mr. White and Daniel were friends and he had even seen them dining together at the Rib Restaurant on occasion; however, he did not find out until the December hearing that Mr. White was not present at the board of director's meeting or that Mr. White had no knowledge of the dealings of 7 Valleys. Additionally, there was testimony from Gail that the affairs of 7 Valleys were always handled informally with little care given to corporate formalities. For example, Gail was not sure if stock certificates were ever issued for 7 Valleys or whether there was a corporate minute book for 7 Valleys. She also stated no board of directors meetings were ever held and no minutes were ever kept.[7]

Ultimately, the trial court entered its "AMENDED JUDGMENT" on August 24, 2010.[8] As to Count I, the trial court found in favor of both Respondents and against Appellants and permanently enjoined Appellants from foreclosing the 2006 loan; as to Count II, the trial court found in favor of Gail and against Appellants declaring the 2006 deed of trust "together with the promissory note [in the amount of $225,000.00] secured thereby to be invalid and unenforceable;" and as to Count III, the trial court found in favor of 7 Valleys and declared the 2006 loan to be "invalid and not enforceable" as to it. Then, the trial court, per Appellants' counterclaim, revived the 1998 loan with a balance due of $123,698.05 and re-established the obligation of Respondents on that promissory note. This appeal followed.

The standard by which this Court reviews a declaratory judgment action is the same as in any other court-tried case.... The judgment will be affirmed unless it is against the weight of the evidence, there is insufficient evidence to support it, or it erroneously declares or applies the law. We defer to the factual findings of the trial court, which is in a superior position to assess credibility.

*Weber v. Moerschel,* 313 S.W.3d 220, 223 (Mo.App.2010) (internal citations omitted).

Appellants now raise three points relied on. In their first point relied on Appellants maintain the trial court misapplied the law in entering judgment in favor of Respondents because there was substantial evidence to establish that 7 Valleys' execution of the 2006 loan was properly authorized and the Bank had no knowledge of any facts undermining its validity or enforceability.[9]

In our review we are guided by certain legal principles as set out in *Linwood State Bank v. Lientz,* 413 S.W.2d 248 (Mo.1967), and *Mercantile Trust Co. v. Carp,* 648 S.W.2d 920 (Mo.App.1983). In *Linwood,* 413 S.W.2d at 251–52, the Linwood State Bank ("the bank") sued Laclede Lientz ("Mr. Lientz") and four co-guarantors to recover $44,237.89 upon their guaranty of obligations of the Lientz Company, Inc. ("the company") made in 1961 and 1962. The record reflects that Mr. Lientz and the four other co-guarantors had signed a

7. Again, as best we discern, the record shows that 7 Valleys had been administratively dissolved by the Secretary of State for failure to file annual registration reports in August of 1998 and August of 2001 and it remained dissolved until reinstated by Daniel on March 1, 2006, just prior to the March 13, 2006, loan closing.

8. The original judgment in this matter was entered on July 17, 2010; however, following

the questioning of that document's finality by Appellants in their motion to amend or correct judgment, the trial court entered an amended judgment.

9. Due to our ultimate determination, we need not review that part of Appellants' Point One contending that Respondents failed to state claims based upon fraud and/or misrepresentation.

guaranty agreement in favor of the bank in exchange for the bank advancing the company credit from time to time. *Id.* at 252. In December of 1963, an involuntary petition in bankruptcy was filed against the company and the bank made demand against the five guarantors for the outstanding $43,114.38. *Id.* Upon failure of the guarantors to make payment, the bank sued. *Id.* In part pertinent to our review, a jury verdict was entered in favor of the bank on its claims against all guarantors. *Id.* On appeal, Mr. Lientz contended that the borrowing by the company from the bank was not authorized as required by the company's bylaws. *Linwood*, 413 S.W.2d at 252. Mr. Lientz maintained the borrowing was therefore illegal and that the bank, through the knowledge of one of its officers, was chargeable with notice of the lack of proper authorization of the borrowing. *Id.* at 252. Mr. Lientz also maintained he had brought the lack of proper authority to the bank officer's attention. *Id.* While the company's minute book contained no record of a directors' meeting on August 9, 1961, the bank produced from its file what appeared on its face to be a certified copy of a resolution of the company's directors, enacted August 9, 1961, authorizing the company's president, secretary or treasurer to procure loans from the bank. *Id.* at 252–53. The instrument bore the signature of the company's president and secretary; however, Mr. Lientz's signature was nowhere on the document and he denied knowledge of any such resolution. *Id.* at 253. In affirming the judgment of the trial court, our supreme court observed that "on its face, [the resolution authorizing the borrowing by the company directors] purports to show due enactment of the resolution by the board of directors and proper authorization for the borrowing." *Linwood*, 413

S.W.2d at 254. Our high court then observed that:

> [the company] would not be permitted to avoid the obligation on the grounds of lack of authority of its officers. The law in this regard is stated in [*Farmers & Merchants Bank v. Burns & Hood Motor Co.*, 295 S.W.2d 199, 202 (Mo.App. 1956),] as follows:

> 'Although the instant note was concededly executed by the president of defendant company, in the absence of express authority from the board of directors, and therefore contrary to the provisions of the applicable by-law, we must nevertheless hold that the note constitutes a binding obligation. This follows because the law is well-settled that where, as here, a corporation with knowledge of the act has ratified it, or has accepted the consideration of the note, it will be as much bound as if the note had been originally executed in exact conformity with the provisions of its by-laws.'

> [Mr. Lientz] stands in no better position than the debtors, and, therefore, cannot avoid the obligation on this ground.

*Id.* at 253 (internal citations omitted).

Likewise, in *Mercantile*, 648 S.W.2d at 921–22, three defendant promissory note guarantors, Herbert Carp, Elaine Carp, and Emile Carp, who were also officers of Carp's Inc. ("the company") at various times, appealed from a summary judgment entered against them in favor of Mercantile Trust Company National Association ("Mercantile"). The record reflects that any two designated corporate officers of the company were by a 1953 board of directors resolution permitted to borrow money or obtain credit on behalf of the company from Mercantile. *Id.* at 922. Then, on October 30, 1970, all three defendant promissory guarantors signed a

"Continuing Guaranty"[10] for the prompt payment when due of any and all indebtedness now or hereafter existing of the company. *Id.* On December 31, 1970, the company through its president, Herbert Carp, entered into a term loan agreement with Mercantile for $1,300,000.00, later augmented by loans from Mercantile to the company totaling $1,700,000.00. *Id.* at 924. At the time of trial some $1,026,652.39 remained outstanding in indebtedness to Mercantile. *Mercantile,* 648 S.W.2d at 922. Mercantile's motion for summary judgment was granted for the foregoing amount and judgment was entered against each defendant promissory note guarantor jointly and severally. *Id.* at 922–23. Each guarantor appealed. *Id.* at 923. In part pertinent to our review, the three defendant promissory note guarantors questioned the corporate authority of the company to execute the notes in question and also questioned the authenticity of the 1953 resolution of the board of directors of the company. *Id.* They contended that the term loan agreement for $1,300,000.00 executed on December 31, 1970, exceeded the limitation placed on the borrowing of the company in the 1977 Board of Director's resolution and they also averred that subsequent notes thereafter were also unauthorized. *Id.* at 924. In affirming the judgment, the reviewing court observed that:

> Herbert Carp signed each of the notes in question while he was president of the corporation. Even if Herbert were not authorized to sign the notes in question, the defendants would still be liable on their guaranty. If a president of a corporation has borrowed money without express authority from the corporate board of directors, the corporation is nevertheless liable for the proceeds if it

has accepted the borrowed money, and the guarantor of corporate debts would be in no better position than the corporation to deny liability.

. . . .

[T]here is no dispute that [the company] received the consideration of $1.7 million for the notes in question and that the sum [of $1,026,652.39] is due and owing, in principal and interest, on these notes. On these facts, [the company] could not assert lack of authority as a defense to the borrowings of its officers and the resulting debt, and the defendants as guarantors, have no better defense than [the company] has against Mercantile's claim.

*Mercantile,* 648 S.W.2d at 924.

▆▆▆ Turning now to the instant case under review, in their pleadings neither of the Respondents is expressly asserting that the Bank defrauded them, that it was engaged in fraudulent practice as to them, or that it otherwise made misrepresentations to either of the Respondents regarding the 2006 loan. Rather, they each solely pleaded that the Bank was *aware* of Daniel's fraud or misrepresentation, without setting out facts supporting these conclusory pleadings. While Jason contacted the Bank warning it not to accept any paperwork not signed by himself, other evidence in the record suggests Jason no longer was president of 7 Valleys or otherwise had held any office in the corporation for several years. Furthermore, nowhere in the trial court's amended judgment does it make a determination that the Bank was engaged in defrauding Gail or otherwise misrepresenting any facts to her. Indeed, Gail had no communications with the Bank regarding the 2006 loan until the summer

---

**10.** "Stripped of its redundant verbiage and legal jargon, the 'Continuing Guaranty' here is simply a divisible offer for a series of separate unilateral contracts. *See* Restatement of Contracts, Second, sec. 31, Comment (b)." *Id.* at 923.

of 2006. Furthermore, she took no action to challenge the loan transaction until foreclosure proceedings were commenced more than a year later, indicating her tacit ratification of the 2006 loan prior to foreclosure.[11] That having been said, it is clear that Daniel took steps to have the Secretary of State rescind her administrative dissolution of 7 Valleys in 2006, prior to the 2006 loan in question. The 2006 Annual Registration Report showed Daniel to hold both the office of President and Secretary of 7 Valleys. Mr. White was listed as the sole member of the Board of Directors. Additionally, the minutes of the January 12, 2006, Board of Directors meeting authorized Daniel, the current President and Secretary of 7 Valleys "to accept and sign on behalf of the corporation the new deed and mortgage of $225,000.00 at [the Bank]." On its face, the resolution authorizing a loan of $225,000.00 was in appropriate form. While Mr. White *later* denied being present at the Board of Directors meeting there is little probative evidence showing the Bank knew he was not present on January 13, 2006. "Generally, a party fails to make out a case for fraud when the facts and circumstances presented are as consistent with honesty and good faith as they are with fraud." *Dechant v. Saaman Corp.*, 63 S.W.3d 293, 295 (Mo.App. E.D.2001). Furthermore, the Bank had previously engaged in loan activities with Daniel in 1998, 2003, 2004 and 2005 without apparent problems. Apparently, Gail was not involved in the latter three transactions. In view of all the foregoing we cannot say that the Bank had no reasonable basis for dealing with Daniel as an authorized representative of 7 Valleys.

 More importantly, as to 7 Valleys, it is unquestioned that the 2006 loan was closed; the outstanding balance on the 1998 loan, $123,698.05, was declared to be paid in full;[12] and 7 Valleys received the sum of $65,000.00. Based on the guiding principles as set out in *Lientz* and *Mercantile, supra,* even assuming the absence of express authority from the board of directors, which we discern was the gravamen of the basis for the trial court's determination, 7 Valleys accepted the consideration of the note, i.e., the payoff of the 1998 note and the additional sum of $65,000.00. Consequently, 7 Valleys, as a corporate entity, is "as much bound as if the note had been originally executed in exact conformity with the provisions of its by-laws." *Linwood*, 413 S.W.2d at 253; *see Mercantile*, 648 S.W.2d at 925. Further, while Respondents maintain Daniel ultimately obtained the benefit of the $65,000.00 in added money, given the particular circumstances set out herein, "[i]f there is authority to borrow, there is no duty on the part of the lender to see that the money is applied to corporate purposes and not diverted by the officer or agent obtaining the loan." *Adelman v. Centerre Bank, N.A.*, 696 S.W.2d 802, 804 (Mo.App.1985); *see also Peoria Life Ins. Co. v. Inter'l Life & Annuity Co.*, 246 Ill.App. 38, 47 (1927). There was substantial evidence introduced at trial establishing the enforceability of the 2006 promissory note in the amount of $225,000.00 and the 2006 deed of trust securing it. The trial

---

11. Gail made no cross-claim against Daniel in these proceedings; thus, he was not a litigant nor did he testify at trial.

12. Gail's guaranty ran only as to the 1998 promissory note which has now been satis-fied. There is nothing in the record showing that Gail guaranteed the 2006 promissory note and she has no individual liability for the 2006 promissory note.

court erred in finding to the contrary. Point One is granted, in part.

In view of our holding in Point One, Appellants' last two points alleging lack of standing by Gail and 7 Valleys to bring their respective causes of action are rendered moot and will not be reviewed.

The amended judgment of the trial court is reversed.

BATES, J. and FRANCIS, P.J., concurs.